**PROVIDENCE JOURNAL CO., Plaintiff,**

v.

**FEDERAL BUREAU OF INVESTIGATION et al., Defendants,**

and

**Raymond L. S. Patriarca, Intervenor.**

Civ. A. No. 77–0526.

United States District Court,
D. Rhode Island.

May 15, 1978.

See also, D.C., 460 F.Supp. 778.

Matthew F. Medeiros, of Edwards & Angell, Providence, R. I., for plaintiff.

Vincent M. Garvey, Civ. Div., U. S. Dept. of Justice, Washington, D. C., Everett C. Sammartino, Asst. U. S. Atty., R. I., Providence, R. I., Harris L. Berson, Providence, R. I., Harvey Brower, Lawrence, Mass., for defendants.

## OPINION

PETTINE, Chief Judge.

This case counterposes rights of privacy, under the Freedom of Information Act[1] and guaranteed by the Constitution, against the right of a newspaper, which asserts the

1. 5 U.S.C. § 552 (1976).

2. Exempt from the disclosure requirements of 5 U.S.C. § 552(a) are:

public's interest, to compel disclosure of governmental files concerning a public figure. At issue are FBI logs derived from an illegal electronic surveillance.

Between March 1962 and July 1965, the FBI tape recorded conversations via an electronic listening device or "bug" implanted without a warrant at the National Cigarette Service, 168 Atwells Ave., Providence, Rhode Island, the place of business of Raymond L. S. Patriarca. Agents then compiled logs and memoranda from those tapes before erasing them. A history of this surveillance may be found in *United States v. Taglianetti,* 274 F.Supp. 220 (D.R.I. 1967), *aff'd* 398 F.2d 558 (1st Cir.), *aff'd per curiam* 394 U.S. 316, 89 S.Ct. 1099, 22 L.Ed.2d 303 (1969), a case involving the prosecution of one of Mr. Patriarca's business associates for tax evasion. At that time the Providence Journal, the leading newspaper in Rhode Island, published the transcripts of the surveillance which had been disclosed in court.

The Providence Journal now seeks complete disclosure of all logs and memoranda derived from the three years of surveillance in the belief that the logs contain information about organized crime in New England and its relationship with various Rhode Island public officials and business and financial leaders.

The Providence Journal submitted a request to the FBI for these documents pursuant to the Freedom of Information Act (FOIA) on November 1, 1976. It indicated that it intended to publish the documents and to use them as the basis for investigative reporting; and it deemed that disclosure was in the public interest and might promote more effective and vigorous law-enforcement.

Clarence Kelley, Director of the FBI, formally refused, on June 10, 1977, to disclose the material based on the investigatory file exemption[2] of FOIA. Disclosure, he as-

Investigatory records compiled for law enforcement purposes, but only to the extent that the production of such records would (A) interfere with enforcement proceedings,

serted, would wrongly interfere with enforcement proceedings, constitute an unwarranted invasion of privacy and divulge a confidential source, 5 U.S.C. §§ 552(b)(7)(A), (C), (D). The newspaper appealed to the Attorney General. When no answer was forthcoming within the statutory period, the Providence Journal filed this suit to compel disclosure, pursuant to 5 U.S.C. § 552(a)(4)(B). Subsequently, the Deputy Attorney General affirmed Director Kelley's refusal to disclose, but only on the basis that disclosure of these "investigatory files compiled for law-enforcement purposes" would "constitute an unwarranted invasion of privacy". Therefore, only that one claim of exemption, 5 U.S.C. § 552(b)(7)(C), is presented to this Court by the Department of Justice.

To protect his privacy interests in the logs and memoranda, Raymond Patriarca moved to intervene in this litigation. In response to Mr. Patriarca's motion of October 7, 1977, for a temporary restraining order to halt any voluntary disclosure by the Department of Justice, this Court ordered the defendant to give notice prior to any proposed release of documents.

On September 7, 1977 at a pre-trial conference called by the Court and attended by counsel, the Court raised *sua sponte* a number of preliminary legal issues which it felt had to be briefed in order to resolve the complex legal questions presented by this litigation. These issues, as set forth in the Court's Order of September 13, 1977, are as follows:

1. Whether the Freedom of Information Act (5 U.S.C. § 552) and the Privacy Act (5 U.S.C. § 552a), when read in light of the Fourth Amendment, require an agency to disclose information which was obtained in violation of that Amendment.

2. Whether Title III of the Omnibus Crime Control and Safe Streets Act of 1968 (18 U.S.C. §§ 2510 *et seq.*) or prior federal legislation would prevent disclosure of transcripts of conversations obtained through illegal means.

3. Whether the foregoing statute or prior such statutes are included within exemption (b)(3) of the Freedom of Information Act and thus specifically exempt from required disclosure.

4. Whether the public's right to know and the right of the press to publish information of public interest prevails over claims that the information was obtained in violation of the proposed intervenor's rights.

5. Whether Mr. Raymond L.S. Patriarca has a right to intervene in this action and, if so, whether he has standing to raise the above issues.

It is these issues the Court will now resolve.

## MOTION TO INTERVENE

Preliminary Question No. 5, *supra*

Raymond Patriarca seeks to intervene in this suit under Fed.R.Civ.P. 24(a). To do so he must claim an interest relating to the property or transaction which is the subject of the action and be so situated that the disposition of the action may, as a practical matter, impair or impede his ability to protect that interest, unless his interest is adequately represented by existing parties.

Mr. Patriarca undoubtedly presents a colorable claim of interest in preserving the privacy of the logs and memoranda which are the subject of this action. Their disclosure would as a practical matter impede, in fact, destroy his ability to protect that interest. This much the plaintiff Providence Journal concedes, as it must. It also admits that the right of intervention in FOIA actions is clearly established.[3]

(B) deprive a person of a right to a fair trial or an impartial adjudication, (C) constitute an unwarranted invasion of personal privacy, (D) disclose the identity of a confidential source and, in the case of a record compiled by a criminal law enforcement authority in the course of a criminal investigation, or by an agency conducting a lawful national security intelligence investigation, confidential information furnished only by the confidential source, (E) disclose investigative techniques and procedures, or (F) endanger the life or physical safety of law enforcement personnel.

5 U.S.C. § 552(b)(7).

3. Cf. *Chamber of Commerce of the United States v. Legal Aid Society,* 423 U.S. 1309, 96

The plaintiff contends, however, that the United States adequately represents Mr. Patriarca's interest in his privacy. Rule 24(a) would not then permit intervention. Plaintiff points to the penalties which may be imposed under FOIA "for arbitrary and capricious withholding of documents,"[4] and assures Mr. Patriarca that these penalties will cause the Department to put on a vigorous defense of its decision to withhold.

■ However, all that Mr. Patriarca must show under Rule 24(a) is that his interest may not be adequately represented; no showing of actual inadequacy is required.[5] Mr. Patriarca's reluctance to rely on the Department of Justice to protect his privacy is understandable. Having been the subject of continuous electronic surveillance by the FBI for three years and the object of a successful U.S. prosecution for, among other charges, the use of the telephone in interstate commerce with the intent to commit murder and to further an unlawful gambling enterprise, *Patriarca v. United States,* 402 F.2d 314 (1st Cir. 1968), *cert. denied,* 393 U.S. 1022, 89 S.Ct. 633, 21 L.Ed.2d 567 (1969), Mr. Patriarca need not now rely on any supposed identity of interest between himself and the Government in keeping the fruits of its electronic surveillance confidential.

■ The plaintiff claims that Patriarca's assertion of the FOIA exemption[6] for personnel and medical files is not sufficiently different from the Government's assertion of exemption 7 for investigatory files to establish his claim of inadequacy of representation. But no such difference in asserted defenses and claims need be shown by the intervenor. Mr. Patriarca has a partic-

ular, unique interest with regard to the logs and memoranda which differs from the more general interest which the Government has in protecting privacy and fulfilling its obligations under FOIA. The personal nature of the privacy interest makes intervention especially appropriate; denial of intervention with the resulting dependence on the Government is especially onerous. No one can better assert an interest in personal privacy than the person whose privacy is at stake.

Courts have not compelled private persons seeking intervention in other cases to depend on the Government's representation of the public interest, when the intervenor asserts some specialized interest justifying intervention.[7] If private parties need not rely on the Government's vigorous assertion of the public interest but are granted their day in court, then surely Mr. Patriarca may have his say when the Government is asserting only his personal interest in privacy. The reasons, such as having a unified and coherent expression of the public interest, which might lead a court to rely exclusively on the Government's advocacy of the public interest are absent in such a case as this.

■ However, plaintiff argues that even if Mr. Patriarca has standing under Fed.R. Civ.P. 24(a), he lacks standing to intervene because this Court cannot grant him relief. Plaintiff argues that the grant of relief would turn this into a "reverse FOIA" action which it considers to "be inconsistent with the basic purpose of the FOIA, which was not to afford confidentiality, but to overcome restrictive agency interpretations of the original public information section . . . ." *Chrysler Corp. v. Schlesinger,*

S.Ct. 5, 46 L.Ed.2d 14 (1975) (Douglas, J. in Chambers); *Sears, Roebuck & Co. v. G.S.A.,* 180 U.S.App.D.C. 202, 553 F.2d 1378 (1977), *cert. denied,* 434 U.S. 826, 98 S.Ct. 74, 54 L.Ed.2d 84 (1977); *Committee on Masonic Homes v. N.L.R.B.,* 556 F.2d 214 (3d Cir. 1977).

4. *See* 5 U.S.C. §§ 552(a)(4)(E), (F).

5. *Sam Fox Publishing Co. v. United States,* 366 U.S. 683, 691, 81 S.Ct. 1309, 6 L.Ed.2d 604 (1961).

6. 5 U.S.C. § 552(b)(6) exempts from the applicability of the disclosure requirements of § 552(a): "personnel and medical files and sim-

ilar files the disclosure of which would constitute a clearly unwarranted invasion of personal privacy."

7. *See, e. g., Trbovich v. United Mine Workers of America,* 404 U.S. 528, 92 S.Ct. 630, 30 L.Ed.2d 686 (1972); *Cascade Natural Gas Corp. v. El Paso Natural Gas,* 386 U.S. 129, 87 S.Ct. 932, 17 L.Ed.2d 814 (1967); *United States v. Reserve Mining Co.,* 56 F.R.D. 408, 416–20 (D.C.Minn.1972); Wright & Miller, Federal Practice and Procedure: Civil § 1909 at 522–33 (1972).

565 F.2d 1172, 1185 (3d Cir. 1977), *cert. granted*, 435 U.S. 914, 98 S.Ct. 1466, 55 L.Ed.2d 504 (1978).

Regardless of whether a reverse-FOIA action lies, Mr. Patriarca has a colorable claim arising directly under the fourth amendment for injunctive relief to protect his right to be free of unreasonable searches and seizures and governmental improprieties with regard to those seizures. He may assert that claim as intervenor in this suit.

With regard to the reverse-FOIA suit, the First Circuit has recognized that review of an agency determination to disclose may be had pursuant to the Administrative Procedures Act, 5 U.S.C. §§ 702–06 (1976), in light of standards derived from common law, statute, regulation or the Constitution. But it has not determined whether a reverse-FOIA suit will lie. *Usery v. Whitin Machine Works, Inc.,* 554 F.2d 498, 503–04 n.4 (1st Cir. 1977).

We need not decide this question, for Mr. Patriarca has a claim under the Privacy Act of 1974, 5 U.S.C. § 552a (1976), which grants plaintiff standing to sue, § 552a(g)(1)(D), for the wrongful disclosure of records pertaining to him where the Government has not first obtained his permission, as required by § 552a(b).[8] Here no permission to disclose his files has been

given by Mr. Patriarca. Plaintiff argues that no such permission is required to disclose under FOIA because the Privacy Act contains an exception to the § 552a(b) requirement of permission, for disclosures "required under section 552 of this title [i. e. FOIA]", § 552a(b)(2), or made "pursuant to the order of a court of competent jurisdiction," § 552a(b)(11). Thus an agency which is required to disclose material under FOIA (that is material not covered by a FOIA exemption) can release it without bringing into play the requirement of § 522a(b) that permission first be obtained. Of course material actually withheld by an agency pursuant to a FOIA exemption is appropriately withheld under the Privacy Act as well. But material exempt from mandatory disclosure under FOIA, which an agency nonetheless chooses to disclose, does implicate the permission requirement of § 552a(b) since the disclosure of such material was not *required* by FOIA; disclosure was in the discretion of the agency. The excepting of material required to be disclosed under FOIA from the operation of the § 552a(b) permission requirement does not include discretionary decisions to disclose.[9] Since a civil action would lie for the discretionary disclosure of such information without permission, a suit for declaratory judgment prior to a discretionary disclosure is

---

**8.** *See* K. Davis, Administrative Law of the Seventies, § 3A.38, at 44 (Cum.Supp.1977).

**9.** On its face the use of the word "required" seems clear enough and recourse to legislative history is inappropriate. We do note, however, that S.Rep. No. 93–1183, *reprinted in* [1974] U.S.Code Cong. & Admin.News, p. 6916, states that the disclosure requirements of the Privacy Act do not apply

> when the disclosure would be required *or permitted* by the Freedom of Information Act of 1966. This provision was included to meet the objections of press and media representatives that the statutory right of access to public records and the right to disclosure of government information might be defeated if such restrictions were to be placed on the public and press. . . .

> While the Committee intends in this legislation to implement the guarantees of individual privacy, it also intends to make available to the press and public all possible information concerning the operations of the Federal Government in order to prevent secret data

banks and unauthorized investigative programs on Americans.

> The Committee does not intend agencies to use the Freedom of Information Act as an excuse to avoid their obligations under this section to obtain informed consent . . . . .

*Id.* at 6985 (emphasis added).

In light of the general purposes of the Privacy Act "to promote governmental respect for the privacy of citizens," *id.* at 6916, the clear language of § 552a(b)(2) which reads "required" and not "required or permitted," and the legislative history which instructs agencies not to use FOIA so as to avoid their obligations under the Privacy Act, we believe that the proper reading of the Act gives Mr. Patriarca standing to challenge the disclosure of private information exempt under FOIA. Any other reading would permit the circumvention of the Privacy Act by the simple technique of seeking information, otherwise private, under FOIA. The interplay of FOIA and the Privacy Act permits an individual whose privacy is at stake to insist that a neutral magistrate superintend and permit disclosure of private matters only to the

also appropriate, 28 U.S.C.A. §§ 2201–02 (1976).

This Court concludes that Mr. Patriarca has standing to intervene and to assert claims arising under the fourth amendment, 5 U.S.C. § 55za and 5 U.S.C. §§ 702, 706, with jurisdiction conferred by 28 U.S.C.A. § 1331 (1976).

## EXEMPTION III

Preliminary Questions No. 2 and 3, *supra*

Intervenor claims that FOIA exemption 3 [10] precludes the compelled disclosure of the surveillance logs because such disclosure is specifically prohibited by Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. §§ 2510–20 (1976).

1) FOIA exemption 3 exempts from disclosure matters specifically exempted from disclosure by some other statute, so long as that other statute leaves no discretion to officials as to whether those matters are to be withheld, or establishes particular criteria for withholding.

The plaintiff argues that the language of Title III is insufficiently specific to qualify

extent which valid public interests require. Disclosures made pursuant to court order are then exempt from the requirements of the Privacy Act, § 552a(b)(11). The only relevant case, construing the FOIA exemption of the Privacy Act, appears not to be inconsistent with this conclusion. *Tennessean Newspaper Inc. v. Levi*, 403 F.Supp. 1318 (M.D.Tenn.1975); *cf. United States v. Brown*, 562 F.2d 1144, 1152 (9th Cir. 1977); *Sears, Roebuck & Co. v. G.S.A.*, 180 U.S.App.D.C. at 207, 533 F.2d at 1383; *Disabled Officer's Ass'n v. Rumsfeld*, 428 F.Supp. 454, 459 (D.D.C.1977); *Christy v. United States*, 68 F.R.D. 375, 378 (M.D.Tex.1975). It should also be noted that none of the exceptions to the applicability of the permission requirement, § 552a(b), contained in §§ 552a(j)(2), (k)(2) and regulations promulgated thereto, 28 C.F.R. §§ 16.71–16.101 (1976), appear to apply to the instant suit.

10. 5 U.S.C. § 552(b), (3) exempts, from the disclosure mandated by § 552(a), matters

specifically exempted from disclosure by statute (other than section 552b of this title), provided that such statute (A) requires that the matters be withheld from the public in such a manner as to leave no discretion on the issue, or (B) establishes particular criteria for withholding or refers to particular types of matters to be withheld.

Title III of the Omnibus Crime Control & Safe Streets Act of 1968 reads in pertinent part:

"contents", when used with respect to any wire or oral communication, includes any information concerning the identity of the parties to such communication or the existence, substance, purport, or meaning of that communication; § 2510(8).

Except as otherwise specifically provided in this chapter, any person who willfully discloses or endeavors to disclose, to any other person the contents of any wire or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire or oral communication in violation of this subsection . . . . shall be fined not more than $10,000

or imprisoned not more than five years, or both. § 2511(1)(c).

Whenever any wire or oral communication has been intercepted, no part of the contents of such communication and no evidence derived therefrom may be received in evidence in any trial, hearing, or other proceeding in or before any court, grand jury, department, officer, agency, regulatory body, legislative committee, or other authority of the United States, a State, or a political subdivision thereof if the disclosure of that information would be in violation of this chapter. § 2515.

(1) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication, or evidence derived therefrom, may disclose such contents to another investigative or law enforcement officer to the extent that such disclosure is appropriate to the proper performance of the official duties of the officer making or receiving the disclosure.

(2) Any investigative or law enforcement officer who, by any means authorized by this chapter, has obtained knowledge of the contents of any wire or oral communication or evidence derived therefrom may use such contents to the extent such use is appropriate to the proper performance of his official duties.

(3) Any person who has received, by any means authorized by this chapter, any information concerning a wire or oral communication, or evidence derived therefrom intercepted in accordance with the provisions of this chapter may disclose the contents of that communication or such derivative evidence while giving testimony under oath or affirmation in any proceeding held under the authority of the United States or of any State or political subdivision thereof. § 2517.

Any person whose wire or oral communication is intercepted, disclosed, or used in violation of this chapter shall (1) have a civil cause of action against any person who intercepts, discloses, or uses [contents] . . . . § 2520.

under exemption 3, especially with regard to the definition of "contents" in § 2510(8). Plaintiff likens § 2511 to 18 U.S.C. § 1905 (1976) which criminalizes the disclosure of "confidential" information by federal officers and which has been held not to qualify under exemption 3.[11] Plaintiff also distinguishes the language of § 2511 from other statutes deemed "specific" for exemption 3 purposes in the legislative history of the 1976 FOIA amendment.[12]

Intervenor notes the specific prohibitions in Title III against disclosure: § 2511(1)(C), imposing criminal sanctions, and § 2520, imposing civil sanctions, for the disclosure of the contents of oral communications intercepted in violation of the specific procedures established in §§ 2516, 2518. He points to §§ 2511(2), 2515, 2517 which detail the conditions under which disclosure may be made. These provisions, he correctly argues, leave no discretion as to whether interceptions may be withheld or disclosed.

■ Thus, exemption 3 criteria are met by Title III; and the contents of electronic surveillance conducted in violation of Title III are exempt from FOIA disclosure. The clear intent of Title III was to establish precise procedures [13] for the interception of oral communication and to establish the conditions for disclosure. The exact working of the statute precludes discretion. Whatever vagueness the definition of "contents" in § 2510(8) may involve, there is no doubt that Congress intended it to refer at least to the actual words and information obtained through surveillance. Nor is there involved in this case any disclosure of law-fully obtained information to other governmental units, § 2517(1), or other circumstances, §§ 2517(2), 2511(2), which might involve discretion.

■ 2) However, the effective date of Title III was June 19, 1968. This Title has not been applied retroactively.[14] Therefore it did not make the electronic surveillance at issue in this case illegal, and therefore subject to its specific criteria preventing disclosure.

Intervenor argues that the spirit of Title III requires its retroactive application in respect to FOIA exemption 3. He points to the great care which Congress took in Title III to protect privacy from electronic intrusions. In passing Title III prospectively, Congress acted against the background of the original and unamended version of FOIA exemption 7 which exempted *all* investigatory records from disclosure, without permitting any judicial balancing of interests to enter into the decision to withhold or disclose.[15] Thus, intervenor argues that Congress, when it enacted Title III, was assured that there would be no disclosure under FOIA of electronic surveillance conducted prior to the effective date of Title III. In amending FOIA exemption 7 in 1974 [16] to provide for more disclosure, intervenor argues, Congress did not have in mind the ever-more-distant problem of pre-1968 illegal surveillance. Rather, it amended exemption 7 against the legislative background of Title III and exemption 3 which, it expected, would completely protect the privacy of all persons subjected to electronic surveillance.

---

11. *See Nat'l Parks and Conservation Ass'n v. Kleppe,* 178 U.S.App.D.C. 376, 389, 547 F.2d 673, 686 (1976); H.R.Rep. No. 94–880 Part I, 94th Cong., 2d Sess. 10 (1976), U.S.Code Cong. & Admin.News 1976, p. 2183, reprinted in Government in the Sunshine Act-S.5 Source Book: Legislative History, Texts and Other Documents (Joint Comm. Print) at 521 (Dec. 1976) (hereinafter 1976 Source Book).

12. *See* H.R.Rep. No. 94–880 Part I, 94th Cong., 2d Sess. 22–23 (1976), *reprinted in* 1976 Source Book at 533–34 (stating that under exemption 3 such statutes qualify as 42 U.S.C. §§ 2000e–5(b); 2000e–8(e); 2 U.S.C. § 437g(a)(3), 49 U.S. C.A. § 1461).

13. *See United States v. Giordano,* 416 U.S. 505, 515, 94 S.Ct. 1820, 40 L.Ed.2d 341 (1974) ("Congress legislated in considerable detail. . . .").

14. *United States v. American Radiator & Sanitary Corp.,* 288 F.Supp. 701 (W.D.Penn.1968).

15. Freedom of Information Act, Pub.L. No. 89–554, 80 Stat. 383 (Sept. 6, 1966); Pub.L. No. 90–23 § 1, 81 Stat. 54 (June 5, 1967).

16. Freedom of Information Act, Pub.L. No. 93–502 § 2, 88 Stat. 1561 (Nov. 21, 1974).

This argument is compelling. But it is not for this Court to create exemptions to FOIA which are not there.[17] When Congress amended exemption 3 in 1976, it gave no indication that statutes prohibiting disclosure were to be applied retroactively with regard to exemption 3.[18]

We conclude that the electronic surveillance at issue in this case is not exempt from disclosure pursuant to exemption 3. This case thus presents a difficult but narrow fourth amendment question with regard to the disclosure of electronic surveillance conducted in violation of the fourth amendment prior to June 19, 1968.

## THE FOURTH AMENDMENT CLAIM

### Preliminary Question No. 1

All parties agree that the electronic surveillance in issue violated the fourth amendment rights of Mr. Patriarca and others. *See United States v. Taglianetti*, 274 F.Supp. at 221–22, 226. The surveillance violated the warrant requirement; in addition, it appears that the breadth of the search in time and extent were per se unreasonable.[19]

Because of this, intervenor claims that the fruits of that surveillance, the logs, should not be disclosed. He makes this claim as two separate defenses, asserting that Congress did not "contemplate materials gathered illegally and held illegally as those materials subject to the operation of the statute [FOIA]" and that "plaintiff is barred by estoppel from recovery (because) plaintiff is, in effect, seeking to benefit from the illegal, unlawful and wrongful conduct of another."

In response, the plaintiff asserts that FOIA cannot be construed to exclude the disclosure of illegally obtained information and that the fourth amendment exclusionary rule should not be imposed on the FOIA scheme of disclosure.

 1) We reject Mr. Patriarca's contention that Congress did not intend disclosure of information which was obtained in violation of the law.[20] Mr. Patriarca points to no legislative history bearing on this question. Plaintiff, however, correctly points to the overwhelming evidence that Congress intended the broadest disclosure of *all* files,[21] especially disclosures which would bring to light official wrongdoing.

17. The Supreme Court has said that FOIA mandates the fullest disclosure save for nine narrowly drawn statutory exemptions, not to be augmented by the courts: the Act reflects "a general philosophy of full agency disclosure unless information is exempted under clearly delineated statutory language. . . . Congress provided in § 552(c) that nothing in the Act should be read to authorize withholding of information or limit the availability of records." *Dept. of Air Force v. Rose*, 425 U.S. 352, 360–61, 96 S.Ct. 1592, 1599, 48 L.Ed.2d 11 (1976).

18. Government in the Sunshine Act, Pub.L. No. 94–409 § 5(b), 90 Stat. 1247 (Sept. 13, 1976); see Conf. Rept. No. 94–1178, 94th Cong., 2d Sess. 24–25 (1976) and H.Rep. No. 94–880 Part I, 94th Cong., 2d Sess. 22–23 (1976), *reprinted in* 1976 Source Book at 806–07, 533–34.

19. The surveillance required a physical intrusion on the premises of Mr. Patriarca, thus implicating the warrant clause under the then applicable rule of *Silverman v. United States*, 365 U.S. 505, 81 S.Ct. 679, 5 L.Ed.2d 734 (1961). With regard to reasonableness, see *Katz v. United States*, 389 U.S. 347, 354–55, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *Berger v. New York*, 388 U.S. 41, 58–60, 87 S.Ct. 1873, 18 L.Ed.2d 1040; *id.* at 65–67, 87 S.Ct. 1873

(Douglas, J. concurring); *United States v. United States District Court*, 407 U.S. 297, 318, 92 S.Ct. 2125, 32 L.Ed.2d 752 (1972).

20. Intervenor also claims that Congress intended only information about the government and its processes and not information about individuals to be disclosed. The Supreme Court rejected this position, by implication, in *Dept. of Air Force v. Rose*, 425 U.S. at 370–77, 96 S.Ct. 1592, by interpreting exemption 6 so as to avoid a blanket exemption of all personnel and medical files. *See also Getman v. N. L. R. B.*, 146 U.S.App.D.C. 209, 219 n.33, 450 F.2d 670, 680 n. 33 (1971). *But cf. Ditlow v. Schultz*, 170 U.S.App.D.C. 352, 358, 517 F.2d 166, 172 (1975) (lesser public interest attaches to information unrelated to government processes).

21. *See* H.R.Rep. No. 1497, 89th Cong., 2d Sess. (1966), U.S.Code Cong & Admin.News 1966, p. 2418, *reprinted in* Freedom of Information Act Source Book: Legislative Materials, Cases, Articles (Senate Jud. Com.) at 22 (1974) (hereinafter 1974 Source Book); S.Rep. No. 813, 89th Cong., 1st Sess., *reprinted in* 1974 Source Book at 45; 1974 Source Book at 83.

Surely, Congress must have foreseen that wrongdoing might include the improper obtaining and maintenance of files by officials. The use of FOIA to bring to light information, including records tainted by illegality arising from "Watergate" wrongdoing, *see Congressional News Syndicate v. U. S. Dept. of Justice*, 438 F.Supp. 538 (D.D.C.1977); *Tax Reform Research Group v. I. R. S.*, 419 F.Supp. 415 (D.D.C.1976), received specific approval in the Congressional debates on the 1974 FOIA amendments.[22] Significantly, in those debates, Congressman Morehead also recognized that information obtained in an illegal national security intelligence investigation could be disclosed under FOIA.[23] Moreover, the Conferees for the 1974 amendments expressly approved, without addressing the legality of the information disclosed, the "present Justice Department policy waiving legal exemptions for withholding historic investigatory records over 15 years old, and they encourage its continuation." [24]

Illegality is not one of the nine FOIA exemptions, and the fact that illegality taints the information does not automatically put it beyond the requirement of disclosure. If such a limit on disclosure exists, it must derive not from FOIA, but from the superior force of the Constitution or another statute, it this case from the superior force of the fourth amendment.

2) The fourth amendment protects persons, not places, safeguarding the privacy of their lives from unreasonable governmental intrusion.[25] It secures this continuing protection of privacy in two ways. First, it erects the exclusionary rule in the courtroom as a deterrent to the police. Second, it makes available, in a case such as this, outside the context of a trial, a remedy to prevent the unwarranted disclosure of information harmful to an individual's interest in his reputation or privacy.

Because the fourth amendment protects persons against intrusion on private places and conversations, even those carried on in the most public of phone booths, it surely follows that the fourth amendment has something to say about the reasonableness of the uses to which the state puts the seized information. Forbidding the state to wiretap a conversation, but providing no remedy when it not only wiretaps but discloses the contents of the conversation to the public would be to recognize a constitutional right without a concomitant remedy.[26] For if an initial intrusion invades privacy, the public disclosure of what is seized destroys it altogether. Moreover, without this penumbral protection for the seized information, the core fourth amendment right to be free of the initial intrusion would be less secure.[27]

**22.** *See* FOIA and Amendments of 1974 (P.L. 93–502) Source Book: Legislative History, Text and Other Documents (Joint Com. Print.) (1975) (hereinafter 1975 Source Book), at 467 (Senator Cranston), at 469 (Senator Bayh), at 477 (Senator Clark), at 436–40 (Senator Kennedy).

**23.** 1975 Source Book at 391; *cf.* H.Rep. No. 94–880 Part I, 94th Cong., 2d Sess. 11 (1976), *reprinted in* 1976 Source Book at 522.

**24.** Conf.Rep. No. 93–1380, 93d Cong., 2d Sess. (1974), *reprinted in* 1975 Source Book at 230.

**25.** *Katz v. United States*, 389 U.S. 347, 351, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967); *see also, Boyd v. United States,* 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746 (1886) ("It is not the breaking of his doors and the rummaging of his drawers, that constitutes the essence of the offense; but it is the invasion of his indefeasible right of personal security"); *Olmstead v. United States,*

277 U.S. 438, 477–85, 48 S.Ct. 564, 72 L.Ed. 944 (1928) (Brandeis, J. dissenting); *Poe v. Ullmann*, 367 U.S. 497, 548–52, 81 S.Ct. 1752, 6 L.Ed.2d 989 (1961) (Harlan, J. dissenting); *Mapp v. Ohio*, 367 U.S. 643, 656, 81 S.Ct. 1684, 6 L.Ed.2d 1081 (1961); *id.* at 661, 81 S.Ct. 1684 (Black, J. concurring); *id.* at 666, 81 S.Ct. 1684 (Douglas, J. concurring); *Camara v. Municipal Court*, 387 U.S. 523, 528, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967); Formalism, Legal Realism, and Constitutionally Protected Privacy Under the Fourth and Fifth Amendments, 90 Harv.L. Rev. 945 (1977).

**26.** *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 392, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971).

**27.** *Cf. Griswold v. Connecticut*, 381 U.S. 479, 482–83, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965). Protection from disclosure may also be found in the fifth amendment due process clause

That there is such a general rule of non-disclosure protecting the privacy of information also may be inferred from the broad prohibitions against disclosure in Title III of the Omnibus Crime Control and Safe Streets Act of 1968,[28] and from a case such as *Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977). There the Court reviewed Richard Nixon's claim that a statute was unconstitutional which established procedures for the sorting of his documents and tapes, produced while he was President, and for the Government's retention of those of public value. He claimed, in part, that the statute violated his fourth amendment and privacy rights in that it authorized a general search of papers which, while not in his possession, he had not abandoned, and which included many strictly " 'private communications between him and, among others, his wife, his daughters, his physician, lawyer, and clergyman, and his close friends, as well as personal diary dictabelts . . . .' " *Id.* at 459, 97 S.Ct. at 2798. In response, the Court wrote

> One element of privacy has been characterized as "the individual interest in avoiding disclosure of personal matters. . . ." *Whalen v. Roe*, 429 U.S. 589, 599 [97 S.Ct. 869, 51 L.Ed.2d 64] (1977) . . . .. (A)t least when government intervention is at stake, public officials . . . are not wholly without constitutionally protected privacy rights in matters of personal life unrelated to any acts done by them in their public capacity. *Id.* at 457, 97 S.Ct. at 2797.

Thus where Government intervention, such as a search and seizure, is involved, persons have a protectable interest as to the disclosure of matters related to their personal lives. Balancing the public's interest in the presidential materials against Mr. Nixon's expectation of privacy, the Court concluded that the intrusion of sorting the material was reasonable and that the precautions taken to prevent "unwarranted disclosure" or "undue dissemination", *id.* at 458, 97 S.Ct. 2777, of private materials were constitutionally sufficient.

That there is some protection from the improper disclosure of information is easier to determine[29] than how much protection,

---

which protects against arbitrary governmental action infringing liberty interests in privacy and reputation. *Cf. id.* at 499–502, 85 S.Ct. 1678 (Harlan, J. concurring).

**28.** *See United States v. Liddy*, No. 73–1020 (D.C.Cir. Jan. 10, 1973) (unpublished order) (granting intervenors' motion to prevent disclosure of contents of wiretaps of Democratic National Committee in prosecution of Gordon Liddy for engaging in illegal surveillance), *rev'g* 354 F.Supp. 217, 221 (D.D.C.1973) (Sirica, J.). *Compare United States v. Liddy*, 166 U.S.App.D.C. 95, 509 F.2d 428, 446 (1974) ("order prohibiting disclosure of the contents . . . vindicated the rights of the movants without undue interference with the [sixth amendment] rights of the accused."), *with United States v. Cianfrani*, No. 77–2445 (3d Cir. 1978) 573 F.2d 835 (balancing sixth amendment interest in a public trial against Title III interest in non-disclosure).

**29.** Plaintiff argues that in light of recent Supreme Court cases, *United States v. Janis*, 428 U.S. 433, 448–54, 96 S.Ct. 3021, 49 L.Ed.2d 1046 (1976); *Stone v. Powell*, 428 U.S. 465, 486–89, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976); *United States v. Calandra*, 414 U.S. 338, 351–52, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974), the fourth amendment does not bar the disclosure of information where no future deterrent effect on police infractions will result. While correctly describing what the Court has recently said, the plaintiff misconceives the context in which these cases were decided:

a) The Supreme Court was addressing, in some of these cases, only the exclusionary rule which has developed from the fourth amendment warrant clause. *See, e. g., Stone v. Powell, supra* (warrantless search, incident to an arrest made pursuant to an ordinance subsequently found to be unconstitutional; warrant supported by affidavit defective under *Spinelli v. United States*, 393 U.S. 410, 89 S.Ct. 584, 21 L.Ed.2d 637 (1969)); *United States v. Janis, supra* (defective affidavit by virtue of retroactive application of *Spinelli* ); *see also Walder v. United States*, 347 U.S. 62, 74 S.Ct. 354, 98 L.Ed. 503 (1954) (warrantless search); *Brown v. United States*, 411 U.S. 223, 225, 229–30, 93 S.Ct. 1565, 36 L.Ed.2d 208 (1973) (defective warrant); *U. S. ex rel. Sperling v. Fitzpatrick*, 426 F.2d 1161 (2d Cir. 1970) (warrantless search). *But see United States v. Calandra*, 414 U.S. 338, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974) (search may have been unreasonably broad; however, the exception created to exclusionary rule was in the context of a grand jury with another provision, Fed.R.Crim.P. 6(e), protecting privacy); *United States v. Schipani*,

for that requires the most careful balancing of interests, *see Stone v. Powell*, 428 U.S. 465, 488, 96 S.Ct. 3037, 49 L.Ed.2d 1067 (1976).

In reaching such a constitutional balance, this Court would consider what impact disclosure would have on deterring future fourth amendment violations. This deterrent rationale, which counsels exclusion in a courtroom of even highly probative evidence, does not counsel suppression in this case; for the surveillance occurred over twelve years ago and the F.B.I. has no interest in seeing these matters disclosed. Non-disclosure would have no deterrent effect. In fact, disclosure might well have a curative impact on police and prosecutorial wrong-doing and mistakes. For it might show the public that the F.B.I.'s reliance on illegal surveillance techniques altogether foreclosed its obtaining admissible evidence of crimes. Disclosure might also show other failures of investigation and prosecution. In reversing a district court's order which completely closed a suppression hearing to

---

435 F.2d 26 (2d Cir. 1970) *cert. denied,* 401 U.S. 983, 91 S.Ct. 1198, 28 L.Ed.2d 334 (1971) (search may have been unreasonably broad). The social costs appear especially high of enforcing the warrant clause exclusionary rule against evidence seized in searches which are reasonable in extent, reasonable in purpose and motive, reasonable by all standards but for a defective or missing warrant. But for a defect in procedure, highly probative evidence of serious crimes would be available for criminal enforcement purposes. This is the context in which the Court states that the chief rationale for the exclusionary rule is its future deterrent effect. The Court has, by and large, not addressed the general rule, derived from the reasonableness clause, which protects the privacies of life and a person's self respect by preventing the use of information for impermissible governmental objectives, and by preventing the disclosure of private information obtained by searches so broad and improper, in method, scope or purpose, that no warrant could ever issue to authorize them.

b) The plaintiff has overlooked a second aspect of the recent Supreme Court decisions by treating them as an absolute bar to the protection of private information by the fourth amendment. But those cases were only the result of the most careful balancing. *See Stone v. Powell*, 428 U.S. at 488, 96 S.Ct. 3037. This instant case must also be decided on the basis of a careful weighing of interests.

c) Even if plaintiffs were to hypothesize a system in which there were no exclusionary rule in criminal trials because of the overwhelming importance of obtaining highly probative evidence, their argument for completely abrogating the general rule against disclosure of private matters would not succeed. Safeguards exist in a criminal proceeding, other than the exclusionary rule, which protect a person's privacy and right to be free from the state's arbitrary use of private information. In a trial, the proposed disclosure of each fact may be objected to, its justification in light of the valid state purpose of proving the elements of a crime must be set forth, and a neutral judge must determine that a proper, useful and not too prejudicial purpose would be served. Centuries of accumulated common law experience find expression in the rules of evidence which guide the release of information in the courtroom. Thus even without an exclusionary rule, wholesale disclosure, undirected to the proof of the elements of a crime and without any purpose but to prejudice the defendant, would still be prohibited in criminal trials. Where courts have permitted disclosure of illegally seized evidence in non-trial contexts, it has been with other appropriate safeguards. *See U. S. ex rel. Sperling v. Fitzpatrick, supra* (disclosure to parole board); *United States v. Schipani, supra* (disclosure to judge).

In *Whalen v. Roe*, 429 U.S. 589, 97 S.Ct. 869, 51 L.Ed.2d 64 (1977), the Court stressed the importance of regulations and standards safeguarding the privacy of information retained by the state. There the Court reviewed the constitutional probity of a centralized computer system in which the State of New York compiles the names and addresses of all persons who obtain certain prescription drugs. Upholding the legitimacy of the system, the Court noted the careful procedures established by New York law which assure, through criminal penalties, that no public disclosure will occur. Moreover, the information is kept under tight security with only limited access permitted to select personnel. The Court stated that, "the enforcement of the criminal laws . . . require[s] the orderly preservation of great quantities of information, much of which is personal in character and potentially embarrassing or harmful if disclosed. The right to collect and use such data for public purposes is typically accompanied by a concomitant statutory or regulatory duty to avoid unwarranted disclosures." *Id.* at 605, 97 S.Ct. at 879. *See Nixon v. Administrator, General Services,* 433 U.S. 425, 457, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977) (stressing importance of regulations assuring non-disclosure of private information).

Thus, the recent Supreme Court cases, while instructive on the deterrent rationale, do not foreclose this Court's protecting private information under the fourth amendment.

the press and public to safeguard privacy, the Third Circuit made a similar argument:

> [O]ften the only time that police conduct is scrutinized in public is at a suppression hearing. The public has a vital interest in learning about the conduct of law enforcement officers . . .. Where there are allegations that the police have violated . . . [Title III], all citizens have a strong interest in learning the facts. This is especially true since electronic surveillance . . . takes place in secret . . .. *United States v. Cianfrani*, 573 F.2d at 850, (3d Cir 1978).

Also favoring disclosure, in this constitutional balance, would be the significant public interest in Raymond Patriarca, a public figure of great notoriety for decades, whose privacy interests are thereby diminished. The public also has a significant interest in disclosures about public officials, and in information relating to official lawlessness, breach of the public trust, and webs of private corruption—all of which are allegedly contained in the logs.

Against these factors favoring disclosure would be Mr. Patriarca's reasonable expectation of privacy, although much attenuated by his status as a public figure and by the long passage of time since the surveillance occurred. In determining the extent of his privacy interest, we would have to consider not only his subjective expectation but the reasonableness of it, in light of those constitutional decisions demarcating the private areas of life.[30]

■ But this Court need not strike a particular constitutional balance in this case, because Congress has already established a statutory scheme, in FOIA's exemption of investigatory files, the disclosure of which would be an unwarranted invasion of personal privacy. This satisfies the constitutional requirements. In FOIA,

Congress has interposed a neutral magistrate to assure that no unreasonable disclosure of seized materials will take place. Guided by the FOIA standard "unwarranted invasion of personal privacy", as that clause is given meaning by the developing case law, this Court can strike a balance between the individual interest in privacy and the public's interest in disclosure, which will be reasonable and which will not breach Mr. Patriarca's constitutionally protected privacy interests.

■ 3) In the alternative, we have concluded that Mr. Patriarca has waived his right to assert this fourth amendment claim, by failing to assert it in a timely fashion. While this Court could have reached that conclusion without first determining that a right to prevent disclosure in fact exists, it deemed prior discussion of the nature of the fourth amendment claim to be important. For the questions in this case are clearly suffused with constitutional overtones and an understanding of the constitutional context is important. Further, this case will likely be appealed and we think it important to reach the fourth amendment claim to facilitate review.

Since the existence of the bugging was first disclosed by the Government on December 27, 1966, over eleven years ago when the case of *Taglianetti v. United States* was on appeal, it has been open to Mr. Patriarca to sue under the fourth amendment for the return or sealing of the seized transcripts. *Go-Bart Importing Co. v. United States*, 282 U.S. 344, 358, 51 S.Ct. 153, 75 L.Ed. 374 (1931); *United States v. Calandra*, 414 U.S. 338, 354–55 n.10, 94 S.Ct. 613, 38 L.Ed.2d 561 (1974). Such suits may be maintained independently of a motion to suppress the use of the information at trial, *Cogen v. United States*, 278 U.S. 221, 225–26, 49 S.Ct. 118, 73 L.Ed. 275 (1929),[31] and

---

**30.** *See, e. g. Roe v. Wade*, 410 U.S. 113, 93 S.Ct. 705, 35 L.Ed.2d 147 (1973); *Doe v. Bolton*, 410 U.S. 179, 209–215, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (Douglas, J. concurring); *Griswold v. Connecticut*, 381 U.S. 479, 85 S.Ct. 1678, 14 L.Ed.2d 510 (1965); *Boyd v. United States*, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746 (1886); *see*

*generally* Tribe, American Constitutional Law, at 886–990 (1978).

**31.** *Burdeau v. McDowell*, 256 U.S. 465, 474, 41 S.Ct. 574, 65 L.Ed. 1048 (1921); *Wise v. Henkel*, 220 U.S. 556, 31 S.Ct. 599, 55 L.Ed. 581 (1911); *Dickhart v. United States*, 57 App.D.C. 5, 6, 16 F.2d 345, 346 (1926); *Dowling v. Col-*

may seek the return of copies, as well as the original, of the seized item.[32]

It will not do now, some 13 years after the last surveillance and 11 years after notice of the surveillance was given, for Mr. Patriarca to bring what is in effect a suit for the return or sealing of illegally seized information in the context of a FOIA proceeding.

The power of a court to hear a suit for a determination of the legality of a search and for the return of seized articles is a "continuing one." *United States v. Napela*, 28 F.2d 898, 903 (N.D.N.Y.1928). However, "[e]ven the constitutional right to move for a return of property illegally seized . . may be impaired, if not lost, when not seasonably asserted." *Id. See Weeks v. United States*, 232 U.S. 383, 398, 34 S.Ct. 341, 58 L.Ed. 652 (1914) ("seasonable application for their return"); *United States v. Hoyt*, 53 F.2d 881, 886 (S.D.N.Y.1931); *United States v. O'Dowd*, 273 F. 600, 601 (N.D.Ohio 1921); *Commonwealth v. Fredericks*, 235 Pa.Super. 78, 340 A.2d 498 (1975); *cf.* Fed.R.Crim.P. 12(b)(3), (f).

Moreover, in *Patriarca v. Bork*, C.A. No. 5385 (D.R.I. Dec. 26, 1973) (Day, J. presiding), where Mr. Patriarca asserted a limited privacy right in these logs, he abandoned his right. There, Mr. Patriarca sought to enjoin the Attorney General from disclosing these same logs to the Rhode Island Parole Board, which was about to consider Mr. Patriarca for parole. While indicating his doubts as to the merits, Judge Day denied Patriarca's motion for a preliminary injunc-tion on the basis of a jurisdictional defect in the pleadings and his failure to make out a case for preliminary relief. The parties agreed to settle the case as moot on January 21, 1974, after the parole board refused to review the tapes and denied parole. Clearly on notice that the logs might subsequently be disclosed to the parole board and to other persons, and clearly cognizant of available remedies, intervenor nonetheless chose to abandon his claim for permanent injunctive relief against all future disclosures and to abandon his right of appeal. This action shows clearly that his failure to assert his claim vigorously during these 11 years was not out of error or ignorance; rather intervenor understood that remedies were available. It can only be concluded that there was "an intentional relinquishment or abandonment of a known right . . . ." *Johnson v. Zerbst*, 304 U.S. 458, 464, 58 S.Ct. 1019, 1023, 82 L.Ed. 1461 (1938).

This Court, with its heavy press of judicial business, cannot permit the fragmentation of privacy claims which would permit a person to litigate a constitutional question each and every time disclosure by the Government to a new person or entity is threatened. Mr. Patriarca had the opportunity to have a definitive ruling or at least one which would have established the ground rules for any further assertion of his fourth amendment claim. He invoked this Court's jurisdiction and then did not press his claims through to a conclusion. He may not now, so many years after his claim arose, assert the claim again.

---

lins, 10 F.2d 62 (6th Cir. 1926); *In re Brenner*, 6 F.2d 425 (2d Cir. 1925); *United States v. Maresca*, 266 F. 713 (S.D.N.Y.1920); *cf. Agnello v. United States*, 269 U.S. 20, 34–35, 46 S.Ct. 4, 70 L.Ed. 145 (1925); *Gouled v. United States*, 255 U.S. 298, 312–13, 41 S.Ct. 261, 65 L.Ed. 647 (1921); *United States v. Hee*, 219 F. 1019, 1020 (D.N.J.1915). *But cf. Dier v. Banton*, 262 U.S. 147, 43 S.Ct. 533, 67 L.Ed. 915 (1923); *Lord v. Kelley*, 223 F.Supp. 684, 689 (D.Mass.) *appeal dismissed*, 334 F.2d 742 (1st Cir. 1964) *cert. denied*, 379 U.S. 961, 85 S.Ct. 650, 13 L.Ed.2d 556 (1965).

**32.** *See, e. g., Hunsucker v. Phinney*, 497 F.2d 29, 34–35 (5th Cir. 1974) *cert. denied*, 420 U.S. 927, 95 S.Ct. 1124, 43 L.Ed.2d 397 (1975); *Goodman v. United States*, 369 F.2d 166, 168

(9th Cir. 1966); *United States v. Kraus*, 270 F. 578, 580–81 (S.D.N.Y.1921) (Learned Hand, J.); *United States v. Lydecker*, 275 F. 976, 980 (W.D.N.Y.1921) (copies of papers returned); *cf. Sullivan v. Murphy*, 156 U.S.App.D.C. 28, 58–59, 63, 478 F.2d 938, 968–69, 973, *cert. denied* (1973), 414 U.S. 880, 94 S.Ct. 162, 38 L.Ed.2d 125 (sealing arrest records, fingerprints and photos from illegal arrests); *Chastain v. Kelley*, 167 U.S.App.D.C. 11, 510 F.2d 1232 (1975); *G. M. Leasing Corp. v. United States*, 429 U.S. 338, 359, 97 S.Ct. 619, 632, 50 L.Ed.2d 530 (1977) ("The books and records were returned, and the [photocopies] concededly have been destroyed; that [fourth amendment] claim, thus, is moot.")

In his answer in this instant suit, Mr. Patriarca raised his constitutional claim in the form of an estoppel that plaintiff should not benefit from another's wrong. Whether intervenor framed his answer in this form because he too recognized that it was too late to assert his right to suppression is unclear. But this Court cannot, under FOIA, exercise its equitable discretion and tailor FOIA exemptions after our own equitable sense.

This Court concludes therefore that Mr. Patriarca has forfeited and waived whatever fourth amendment right he had to have the Government refrain from disclosing the illegally seized conversations and their fruits.

## THE FIRST AMENDMENT AND DISCLOSURE

### Preliminary Question No. 4, *supra*

Disclosure under FOIA advances important first amendment interests. It protects the public's right to know about public persons, official and unofficial. In this case disclosure would give to one of our newspapers, representing the public's right to know, access to information held by the Government so that it can inform the public on matters of concern to them.

In various contexts, the Supreme Court has recognized that the right to know and to have access to information is an essential part of the first amendment.[33]

Through FOIA, Congress protected this first amendment interest and created a "clear right in the public and the press" to have access to information held by the Government.[34] In the original floor debates, Representative Moss affirmed that: "Inherent in the right of free speech and of free press is the right to know. It is our solemn responsibility as inheritors of the cause to do all in our power to strengthen those rights. . . ."[35] Mr. King of Utah stated "If the people are to be informed, they must first be accorded the right to sources of knowledge. . . ."[36] The Senate Report to the 1974 amendments states, "Since the First Amendment protects not only the right of citizens to speak and publish, but also to receive information, freedom of information legislation can be seen as an affirmative congressional effort to give meaningful content to constitutional freedom of expression."[37] Senator Kennedy said in debate on the amendments,

> An important objective . . . is to give concrete meaning to one aspect of this [first amendment] right to receive information from the Federal Government. . . .

33. *See e. g., Virginia State Bd. of Pharmacy v. Virginia Consumer Council, Inc.,* 425 U.S. 748, 764–65, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1975); *Hynes v. Mayor of Oradell,* 425 U.S. 610, 620–21 n.4 & 5, 96 S.Ct. 1755, 48 L.Ed.2d 243 (1975); *Procunier v. Martinez,* 416 U.S. 396, 408–09, 94 S.Ct. 1800, 40 L.Ed.2d 224 (1974); *Kleindienst v. Mandel,* 408 U.S. 753, 762–63, 92 S.Ct. 2576, 33 L.Ed.2d 683 (1972); *Red Lion Broadcasting Co. v. F. C. C.,* 395 U.S. 367, 396, 89 S.Ct. 1794, 23 L.Ed.2d 371 (1969); *Stanley v. Georgia,* 394 U.S. 557, 564, 89 S.Ct. 1243, 1247, 22 L.Ed.2d 542 (1969) ("It is now well established that the Constitution protects the right to receive information and ideas."); *Lamont v. Postmaster General,* 381 U.S. 301, 307–08, 85 S.Ct. 1493, 14 L.Ed.2d 398 (1965); *Martin v. Struthers,* 319 U.S. 141, 143, 63 S.Ct. 862, 87 L.Ed. 1313 (1943); *see also, Griswold v. Connecticut,* 381 U.S. 479, 482, 85 S.Ct. 1678, 1680, 14 L.Ed.2d 510 (1965) ("The State may not . . . contract the spectrum of available knowledge"); *Doe v. Bolton,* 410 U.S. 179, 209–11, 93 S.Ct. 739, 35 L.Ed.2d 201 (1973) (Douglas, J.

concurring); *Kent v. Dulles,* 357 U.S. 116, 126, 78 S.Ct. 1113, 2 L.Ed.2d 1204 (1958); *Marsh v. Alabama,* 326 U.S. 501, 505, 66 S.Ct. 276, 90 L.Ed. 265 (1946); *Thomas v. Collins,* 323 U.S. 516, 534, 65 S.Ct. 315, 89 L.Ed. 430 (1945); *Brooks v. Auburn,* 412 F.2d 1171, 1172 (5th Cir. 1969); Forkosch, Freedom to Hear: A Political Justification of the First Amendment, 46 Wash. L.Rev. 311 (1971).

34. *See* 1974 Source Book at 2; H.Rep. No. 1497, 89th Cong., 2d Sess., *reprinted in* 1974 Source Book at 23; *Tennessean Newspapers, Inc. v. Federal Housing Ad.,* 464 F.2d 657, 660 (6th Cir. 1972).

35. 112 Cong.Rec. H 13007 (June 20, 1966), *reprinted in* 1974 Source Book at 47.

36. *Id.* at 50.

37. S.Rep. No. 93–854, 93d Cong., 2d Sess. 2, *reprinted in* 1975 Source Book at 154.

. . . The protections of the act thus become protections for the public's right to receive information and ideas. And the accomplishments of the act become fuller implementation of the first amendment of the Constitution.[38]

Moreover, the legislative history stressed the important democratic role the Act could play in informing the electorate. Accordingly, the legislative materials repeatedly quoted James Madison:

A popular Government without popular information, or the means of acquiring it, is but a Prologue to a Farce or a Tragedy; or, perhaps both. Knowledge will forever govern ignorance; And the people who mean to be their own Governors, must arm themselves with the power, which knowledge gives.[39]

Finally, the crucial role the press plays as a check upon governmental abuse and lawlessness was again and again cited in the legislative debate on FOIA. An awareness of Watergate wrongdoing and the role of the press in uncovering it pervaded the enactment of the 1974 amendments. In those debates, Senator Kennedy stressed the importance of the first amendment in securing honest government, and he quoted Justice Brandeis: "Publicity is justly commendable as a remedy for social and industrial disease. Sunlight is said to be the best disinfectant, and electric light the most effective policeman." [40]

This Court has the deepest conviction that a vigorous and free press, acting on the basis of the maximum access to governmental information, serves as a constant check on the excesses, mistakes and wrongdoing of all branches of government. Wherever possible and consistent with Congress' mandate and the first amendment, it is for the courts to further the freedom of the press to pursue vigorously its search for the truth.

However, I must advert to a spectre of abuse of the government's duty to disclose, which this decision calls to mind. Instead of protecting the right to know and facilitating a newspaper's access to governmental information, the improper disclosure of information can be used to threaten political expression and coerce conformity. We need only remember the FBI's surveillance of Martin Luther King and the use of information or misinformation against him, and recall the burglary of Daniel Ellsberg's psychiatrist, which was carried out for the express purpose of obtaining information to leak to the press,[41] and note that the White House authorized the break-in and bugging of the Democratic National Committee and has used its access to various governmental agencies to gain information about those not in favor, to accept immediately the proposition that the executive's disclosure or threatened disclosure of information, improperly obtained or retained, can impair core first amendment rights.[42]

---

**38.** Cong.Rec. S9310–S9343 (remarks of Senator Kennedy) (May 30, 1974), *reprinted in* 1975 Source Book at 284–85.

**39.** Letter from James Madison to W. T. Barry, Aug. 4, 1822, in The Complete Madison (Padover ed.) (1953) at 337, *reprinted in* 1974 Source Book at 6.

**40.** Cong.Rec. S9310–S9343 (remarks of Senator Kennedy) (May 30, 1974), *reprinted in* 1975 Source Book at 284–85. *Cf. United States v. Cianfrani*, 573 F.2d 835 at 846–848, 852–854 (3d Cir. 1978).

**41.** *See United States v. Ehrlichman*, 178 U.S. App.D.C. 144, 149 n.6, 546 F.2d 910, 915 n.6 (1976) *cert. denied*, 429 U.S. 1120, 97 S.Ct. 1155, 51 L.Ed.2d 570 (1977) (testimony that "part of the purpose in examining [Ellsberg's psychiatrist's] files was to obtain information

that could be made public through Congressional investigations, hearings or by release to the newspapers" so that those in the White House could "bring about a change in Ellsberg's image."); *see also United States v. Liddy*, 177 U.S.App.D.C. 1, 3–4, 542 F.2d 76, 78–79 (1976); *United States v. Haldeman*, 181 U.S. App.D.C. 254, 278–279, 311–314, 559 F.2d 31, 55–56, 88–91 (1976); *cf. Zweibon v. Mitchell*, 170 U.S.App.D.C. 1, 42–43 n.107, 516 F.2d 594, 635–36 n.107 (1975), *cert. denied*, 425 U.S. 944, 96 S.Ct. 1684, 48 L.Ed.2d 187 (1976).

**42.** Courts have demonstrated sensitivity to the first amendment and privacy problems surrounding the disclosure of personal information. *See, e. g., Socialist Workers Party v. Attorney General of the United States*, 510 F.2d 253, 257 (2d Cir. 1974), *stay denied*, 419 U.S. 1314, 95 S.Ct. 425, 42 L.Ed.2d 627 (1974) (Mar-

In this case, however, there is no evidence that information was obtained or retained for improper reasons under the first amendment. While public officials and figures were allegedly the subject of surveillance, there is no hint that this was undertaken because of their political beliefs or activities. Thus in this case, first amendment interests counsel not the withholding of information but its disclosure.

Resolution of the remaining claims of exemption, §§ 552(b)6, 4 and 7(c), are deferred pending discovery as requested by counsel.

In light of this Opinion, the Court considers the plaintiff's Renewed Motion to Require Preparation of Document Index and hereby orders that the defendants either consent to the preparation of such an index or file and serve a memorandum of law in opposition to that Motion, on or before May 25, 1978.

The plaintiff will prepare an order accordingly.

shall, J. in Chambers); *Tarlton v. Saxbe*, 165 U.S.App.D.C. 293, 301, 507 F.2d 1116, 1124 (1974); *Boorda v. Subversive Activities Control Bd.*, 137 U.S.App.D.C. 207, 213, 421 F.2d 1142, 1148 (1969), *cert. denied*, 397 U.S. 1042, 90 S.Ct. 1365, 25 L.Ed.2d 653 (1970); *Halperin v. Kissinger*, 424 F.Supp. 838, 845 (D.D.C.1976); *Menard v. Mitchell*, 328 F.Supp. 718, 726 (D.D.C.1971), *rev'd*, 162 U.S.App.D.C. 284, 498 F.2d 1017 (1974). Various suits for damages, alleging the illegal collection and dissemination of information in violation of first amendment rights, have survived motions to dismiss. *See, e. g., Philadelphia Yearly Meeting of the Religious Society of Friends v. Tate*, 519 F.2d 1335 (3d Cir. 1975); *Berlin Democratic Club v.*

*Rumsfeld*, 410 F.Supp. 144, 150–51 (D.D.C. 1976); *Alliance to End Repression v. Rochford*, 407 F.Supp. 115, 117–18 (N.D.Ill.1975); *Handschu v. Special Services Div.*, 349 F.Supp. 766, 768–70 (S.D.N.Y.1972). Courts have also limited the power of Congress to expose information about persons, without a proper legislative purpose. *See, e. g., Kilbourn v. Thompson*, 103 U.S. 168, 26 L.Ed. 377 (1881); *Watkins v. United States*, 354 U.S. 178, 194–200, 77 S.Ct. 1173, 1 L.Ed.2d 1273 (1957); *cf. Barenblatt v. United States*, 360 U.S. 109, 153, 79 S.Ct. 1081, 3 L.Ed.2d 1115 (1959) (Black, J. dissenting); *id.* at 166, 79 S.Ct. 1081 (Brennan, J. dissenting); T. Emerson, The System of Freedom of Expression at 247–84 (1970).