**Raymond J. PATRIARCA, Plaintiff,**

**v.**

**FEDERAL BUREAU OF INVESTIGA-TION and William H. Webster, Director and United States Department of Justice and Edwin Meese, Attorney General and the Providence Journal Company.**

**In the Matter of Application To Adjudge the PROVIDENCE JOURNAL COMPANY and Its Executive Editor, Charles M. Hauser, In Criminal Contempt.**

Civ. A. No. 85–0707B.
Misc. No. 86–003B.

United States District Court,
D. Rhode Island.

March 18, 1986.

William A. Curran, Hanson, Curran & Parks, Providence, R.I., for Special Prosecutor.

John F. Cicilline, Providence, R.I., Paul G. Garrity, McGrath, Kane & Garrity, Boston, Mass., for plaintiff Raymond Patriarca.

Joseph V. Cavanaugh, Edwards & Angell, Providence, R.I., for defendant Providence Journal.

---

Lincoln Almond, U.S. Atty., Providence, R.I., Everett Sammartino, Asst. U.S. Atty., for defendant Federal Bureau of Investigation.

## OPINION

FRANCIS J. BOYLE, Chief Judge.

The Defendant Providence Journal Company (hereinafter "the Journal") was directed to show cause why it was not in contempt of a temporary restraining order entered by the Court on November 13, 1985. The order directed that the Journal not publish information collected more than twenty years ago in violation of the Fourth Amendment rights of Plaintiff Raymond J. Patriarca. At issue are three fundamental constitutional principles: (1) freedom of the press; (2) the right of the people to be secure in their persons, homes, papers and effects under the Fourth Amendment; and (3) the judicial power of the United States. In this instance the controversy is resolved in favor of the people and the United States.

The Journal publishes two daily newspapers and a Sunday paper. Its views enjoy statewide distribution within Rhode Island. It is the only newspaper which does. Its own description of the event which gives rise to this action appeared in a "banner" front page headline of one of its November 14, 1985 publications. The headline stated, "Court, Journal clash over use of tapes." The sub heading proclaimed, "Despite ruling on Patriarca suit newspaper decides to print excerpts from FBI recordings." The first paragraph reads:

"A federal judge yesterday ordered the *Journal Bulletin* not to publish information about reputed mob leader Raymond J. "Junior" Patriarca obtained through illegal FBI surveillance. Citing the Constitution's guarantee of a free press, the newspaper today published an article despite the order."

The sole issue at this time is whether a publication can be ordered deferred to permit a court an opportunity to determine the right to publish. The Journal argues that the judicial power of the United States does not permit a court to determine this right, and that the Fourth Amendment protection of the people's rights to be secure in their persons, homes, papers and effects is overriden by the freedom of the press secured by the First Amendment. The Journal seeks to justify its violation of law by labeling the order a "prior restraint" and "censorship."

Two essential facts are admitted: (1) the information published was obtained by the Government in violation of the Plaintiff's Fourth Amendment rights; (2) the Defendant Journal willfully and deliberately violated the temporary restraining order entered November 13, 1985.

The Court determines (1) that the Journal does not enjoy its claimed unique, superior constitutional status, free of all judicial inquiry; (2) that the people of the United States are entitled a judicial determination of the extent of their Fourth Amendment security; (3) that it has been previously determined that the Journal had no right to the information, a determination of which the Journal had actual knowledge, and (4) that determinations of constitutional rights are vested by the Constitution in the Courts of the United States.

## I. THE FACTS

The initial complaint was filed by Raymond J. Patriarca on Friday, November 8, 1985. On the following Wednesday (November 13), the Court met in Chambers with counsel for all parties to consider only the application of Raymond J. Patriarca for a restraining order. The Court was advised that the Plaintiff was not then seeking any relief on behalf of Raymond L.S. Patriarca, deceased. The Court granted the request for a temporary restraining order and offered to hear counsel in open Court the following morning on whether the restraining order ought to be continued. Counsel for the Defendant Journal advised that it was not prepared to proceed on such short notice, and at the request of the Journal's counsel, a hearing was set for Friday (November 15). The next morning,

Thursday the 14th, the article appeared in the Journal. Following the Friday hearing, the Court scheduled a hearing on Plaintiff's motion for a preliminary injunction for the following Tuesday (November 19). On November 19, 1985 the motion for preliminary injunction was denied as to the Journal but granted as to the Federal Bureau of Investigation (hereinafter "the FBI") and the Justice Department.

The restraining order which entered on November 13 restrained the Defendant, Journal from

> distributing, disseminating or otherwise publishing the logs or airtels, or reports thereof, generated as a result of electronic surveillance conducted at 168 Atwells Avenue, between March of 1962 and July of 1965, as they relate to Raymond J. Patriarca, pending hearing at 10:00 P.M. on Friday, November 15, 1985.

Within hours of the entry of the order, no later than 10:30 P.M. that very day, the Journal determined that it would violate the restraining order. Various reasons were advanced including the reason that the order constituted "censorship" and was a "prior restraint" and that to defer publication even for a day was to invite politicians and gangsters to use the same tactics to prevent publication of unfavorable information.

On its front page, the Journal in all its publications on Thursday, November 14, published a story which reported alleged conversations between Raymond J. Patriarca and his father, Raymond L.S. Patriarca which had been electronically intercepted by the Federal Bureau of Investigation. The report was based on copies of summaries of conversations which had taken place between 1962 and 1965, some twenty years previous. The story written by Robert Kramer reported that the elder Patriarca, according to the FBI's version of the conversation, advised his son, Raymond J. Patriarca, "You only lie to cops and people you don't know," and "he should marry an Italian girl as she will stand by you when you are in trouble, or won't call the police if you rap her in the mouth." The alleged conversations also concerned the son's difficulties in school and with his friends, both male and female. The tapes that contained the actual statements had been long since destroyed and all that was available to the Journal were the summaries prepared by FBI Agents. The news story was entitled, "The Patriarca Tapes"; in fact, there are no such tapes.

At the foot of the story, was the "Journal's Statement," which professed respect for the judge who had entered the restraining order. The statement read, in part: "... in this case we are convinced that his order would impose a prior restraint in violation of the Constitution. For that reason we have decided to publish in today's Journal Bulletin the first of a series of stories based on the Patriarca tapes."

A motion to cite the Journal in contempt was filed by Raymond J. Patriarca on November 14, 1985, and when he declined to prosecute the motion, and because the Government was already a party, the Court appointed William A. Curran, Esquire, as a special prosecutor as authorized by Rule 42(b) of the Federal Rules of Criminal Procedure. The Journal elected to proceed without a jury and the parties have stipulated to the facts. The parties were heard on an order directing the Journal to show cause why it should not be held in contempt.

## II. PROVIDENCE JOURNAL CO. V. F.B.I.

This controversy has a history. Between the years 1962 and 1965, the FBI maintained a "bug" which recorded conversations within the premises located at 168 Atwells Avenue, in the City of Providence. The property was occupied by Raymond L.S. Patriarca, who police officials claimed was the head of Organized Crime in southeast New England. The "bug" was placed without benefit of a warrant of any kind. It was placed in violation of the Fourth Amendment prohibition of unlawful searches and seizures. The information that was obtained through the use of the

bug was obtained by the Government in violation of the Fourth Amendment to the United States Constitution.

The Journal sought disclosure of the tapes from the Department of Justice. The initial request, made November 1, 1976, was refused on the basis that the disclosure of investigatory files compiled for law enforcement purposes would be "an unwarranted invasion of privacy" under the provisions of 5 U.S.C. § 552(b)(7)(C). The Journal brought suit in this district to compel disclosure of logs and memoranda made by agents from the tapes which had by that time been erased. *Providence Journal Co. v. F.B.I.*, 460 F.Supp. 762 (D.R.I.1978), *rev'd*, 602 F.2d 1010 (1st Cir.1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980). Raymond L.S. Patriarca was permitted to intervene in the action because Mr. Patriarca's interests "may not [have] be[en] adequately represented" by the Government which had bugged his premises in the first instance. The court (Pettine, Ch. J.) noted that Mr. Patriarca has "a colorable claim arising directly under the Fourth Amendment for injunctive relief to protect his right to be free of unreasonable searches and seizures and governmental improprieties with regard to those seizures." 460 F.Supp. at 767.

Two passages from Chief Judge Pettine's opinion, of which the Journal must be charged with actual knowledge, bear statement at this point:

Because the fourth amendment protects persons against intrusion on private places and conversations, even those carried on in the most public of phone booths, it surely follows that the fourth amendment has something to say about the reasonableness of the uses to which the state puts the seized information. Forbidding the state to wiretap a conversation, but providing no remedy when it not only wiretaps but discloses the contents of the conversation to the public would be to recognize a constitutional right without a concomitant remedy. For if an initial intrusion invades privacy, the public disclosure of what is seized destroys it altogether. Moreover, without this penumbral protection for the seized information, the core fourth amendment right to be free of the initial intrusion would be less secure.

460 F.Supp. at 771. Given such language, surely the Journal was aware that some judicial thinking would require there be a remedy for violations of the Fourth Amendment rights of all. The Court further stated:

However, I must advert to a spectre of abuse of the government's duty to disclose, which this decision calls to mind. Instead of protecting the right to know and facilitating a newspaper's access to governmental information, the improper disclosure of information can be used to threaten political expression and coerce conformity. We need only remember the FBI's surveillance of Martin Luther King and the use of information or misinformation against him, and recall the burglary of Daniel Ellsberg's psychiatrist, which was carried out for the express purpose of obtaining information to leak to the press, and note that the White House authorized the break-in and bugging of the Democratic National Committee and has used its access to various governmental agencies to gain information about those not in favor, to accept immediately the proposition that the executive's disclosure or threatened disclosure of information, improperly obtained or retained, can impair core first amendment rights.

460 F.Supp. at 777. The First Amendment rights referred to are not the rights of a free press but the rights of a free people. Again, the Journal must be charged with knowledge and notice of this caveat because it was emphasized in connection with the effort of the Journal to obtain the same information which is the basis of this action. In this earlier action the district court refused to make available matters relating to Mr. Patriarca's family relationship and details of private lives of his family members who are still living.

Pending appeal, the Government and Mr. Patriarca sought a stay of that part of the district court's order which required disclosure. In its consideration of the application for the stay, the Court of Appeals for the First Circuit pointed out that the District court declined to stay proceedings for more than a brief time because a longer stay would be a "prior restraint" upon the Journal's publication rights. *Providence Journal Co. v. F.B.I.*, 595 F.2d 889, 890 (1st Cir.1979). The Court of Appeals granted the stay on February 20, 1979, and stated at page 890:

> Appellants are not, of course, entitled to a stay pending appeal without showing that their appeals have potential merit. We believe that they have made a sufficient showing on this score. Where, as here, the denial of a stay will utterly destroy the status quo, irreparably harming appellants, but the granting of a stay will cause relatively slight harm to appellee, appellants need not show an absolute probability of success in order to be entitled to a stay. *See Washington Metropolitan Area Transit Commission v. Holiday Tours*, 182 U.S.App. D.C. 220, 559 F.2d 841 (1977). Our reading of the district court's opinions and of the briefs indicates that there are serious legal questions presented. The district court itself stated,

>> "[T]his is a case of initial impression wherein respectable minds might differ and [embodied] a strong public policy...."

> Failure to grant a stay will entirely destroy appellants' rights to secure meaningful review. On the other hand, the granting of a stay will be detrimental to the Journal (and to the public's interest in disclosure) only to the extent that it postpones the moment of disclosure—assuming the Journal prevails—by whatever period of time may be required for us to hear and decide the appeals. Weighing this latter hardship against the total and immediate divestiture of appellants' rights to have effective review in this court, we find the balance of hardship to favor the issuance of a stay.

The stay was in effect for more than five months, from February 20, 1979 to July 27, 1979, the time required to hear and determine the controversy. At no time from the beginning of the litigation was the Journal permitted disclosure of Patriarca family information.

The restraining order issued by this Court was not the first time that the Journal had been prevented from publishing information concerning the Patriarca family illegally obtained. In *Providence Journal Co. v. F.B.I.*, 602 F.2d 1010 (1st Cir. 1979), *cert. denied*, 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980), the Court of Appeals held that the disclosure of the information would violate Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq., as a disclosure of unlawfully obtained information. The Court of Appeals was not concerned that the information was collected before the effective date of the Act (Title III) since disclosure which is also forbidden would take place after the effective date of the Act. The court in part stated, "... the invasion of privacy is not over when the interception occurs, but is compounded by disclosure.... Congress has, in the clearest way, thus decided that the privacy interest of a victim of illegal electronic surveillance is too great to permit any disclosure at all." 602 F.2d at 1013.

In order to emphasize the point the court stated further: "Congress had decided that the risk to privacy created by electronic surveillance is too great to permit any disclosure of the fruits of such surveillance.... In fact, this was exactly the kind of 'insidious invasion of privacy' that Congress 'singled out for special scrutiny and safeguards.' (cite omitted) Intrusions before 1968 were no less insidious than intrusions after 1968, and to the extent reasonable, the victims should be protected from disclosure after 1968 in accord with Congress' stated policy." 602 F.2d at 1013–14.

This determination certainly should have ended the matter, for the clear holding of

the Court of Appeals was that the information obtained by means of illegal electronic surveillance from 1962 to 1965 may not be disclosed by the Journal after 1968. It was determined that the disclosure by either the Providence Journal or the Government was forbidden by an Act of Congress. It is also clear that the determination does not rest on a right of privacy based on constitutional or common law, but on a determination of Congress' dealing with the burdens and benefits of electronic surveillance.

Such was not to be however. With the death of Raymond L.S. Patriarca, the Journal revived its efforts which appeared already to have been foreclosed for all time by its loss in the Court of Appeals. This time, the Government had changed its position, and in spite of the fact that the Court of Appeals had already held that Congress had forbidden disclosure of the very information sought, it delivered the information, not only to the Journal, but to a number of other news agencies as well.[1] The Journal received the information in the summer of 1985 and published it on November 14, 1985.

The initial complaint filed in this action was based on the Freedom of Information Act, 5 U.S.C. § 552. However, in the motion for temporary restraining order and the memorandum in support, the Plaintiff asserts Fourth Amendment arguments. In the memorandum, Plaintiff specifically cited *Providence Journal Co. v. F.B.I.*, 602 F.2d 1010, and argued that disclosure of the information was barred by that opinion as a violation of Title III.

## III. THE JOURNAL'S CONTENTIONS

At the time of the application to this Court, this Court, like the Court of Appeals in the earlier proceeding, was concerned that unless the status quo was maintained for a time until the Court could sort out the various contentions, there would be no status to preserve, and publication would make the matter moot. The immediate issue raised by the application for a restraining order was whether publication should be delayed to afford to a court the opportunity to consider and react. The Journal was not then prepared to go to an immediate hearing on the continuance of the restraining order and itself asked for and obtained an additional day to prepare for a hearing. Thus, with significant legal issues raised and the fact that those issues would be essentially moot unless the Court acted to forestall immediate publication, a temporary restraining order was entered.

It is that order that was immediately and deliberately ignored and willfully disobeyed. The Journal does not contest a willful and deliberate violation of the order. Indeed, it could not because it made clear that it wished an immediate confrontation wrapped in the protective banner of the First Amendment freedom of the press. Rather, the Journal looks to ex post facto relief as an escape from its obvious contempt. It argues (1) that violation of a restraining order affecting "pure" speech cannot be the basis for criminal contempt if the order is later invalidated; and (2) that the Court "clearly lacked subject matter jurisdiction" and therefore, there can be no contempt.

### 1. Subject Matter Jurisdiction

The argument that the Court lacks jurisdiction of the subject matter proceeds on the theory that the claim to jurisdiction of the Plaintiff here is frivolous. The Journal asserts that the only basis for jurisdiction here asserted are the Freedom of Information Act (FOIA), 5 U.S.C. § 552, and Title III of the Omnibus Crime Control and Safe Streets Act of 1968, 18 U.S.C. § 2510, et seq. The Journal also asserts that there was an ineffective Fourth Amendment claim put forth by the Plaintiff. What the Journal argues is not that the Court lacks subject matter jurisdiction, that is the law-

---

1. Willful disclosure is a felony, 18 U.S.C. § 2511(1)(c)(d). 18 U.S.C. 2520 provides a civil action for damages. Injunctions are not precluded. *See Spock v. United States,* 464 F.Supp. 510 (S.D.N.Y.1978). Since the Government was also a party to that action, it was on notice of the Court of Appeals' opinion that disclosure after 1968 of information illegally obtained before 1968, is a violation of Title III.

ful ability of a court to resolve a controversy, but that the Plaintiff does not state a claim upon which relief may be granted. Thus, the Journal argues that there is no basis for injunctive relief under the Freedom of Information Act, citing *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), and that Title III of the 1968 Crime Control Act does not provide for "injunctive relief barring disclosure of information wrongfully intercepted prior to the statute's enactment.[2] *Mirabile dictu*, the Journal cites the District Court opinion which was reversed on this precise issue by the Court of Appeals, "*Providence Journal Company v. Federal Bureau of Investigation*, 460 F.Supp. 762, 679 (sic)." The Journal also relies on *Zerilli v. Evening News Ass'n*, 628 F.2d 217 (D.C.Cir. 1980). In *Zerilli*, the District of Columbia Circuit did hold that Title III remedies apply only to interceptions which took place after 1968. This is clearly not the law in this Circuit. The D.C. Court also held that there was no independent Fourth Amendment claim against a publisher of illegally obtained information, declining to extend a *Bivens* type remedy.[3] *See Bivens v. Six Unknown Named Agents of Federal Bureau of Narcotics*, 403 U.S. 388, 91 S.Ct. 1999, 29 L.Ed.2d 619 (1971). Of course, *Bivens* could only apply to government officials. It came to this conclusion on the basis that the Fourth Amendment is concerned only with searches and seizures and that the First Amendment freedom of the press "militates against such a result." However, it is well established that individual criminal defendants may enforce the exclusionary rule and nothing makes the First Amendment superior to the Fourth Amendment.

Of course, the issue is not what is known now regarding the Court's jurisdiction, but what was known at the time that the restraining order entered. Certainly no court is charged with instantaneous knowledge of all applicable precedent. Indeed, there is nothing to suggest that the Journal called to the Court's attention before the publication any authority relevant to the jurisdiction issue. It is to be remembered that the purpose of the temporary restraining order was to hold matters in *status quo* pending a brief interlude for research and contemplation. Courts simply cannot function as "drive in" businesses if the quality of the judicial product is to be worthwhile.

■ This Court has subject matter jurisdiction over this controversy. The Plaintiff seeks enforcement of a constitutional right and enforcement of federal statutory rights. The possibility that Plaintiff may not succeed has nothing to do with the right of this Court to determine whether or not he may succeed.

### 2. The Validity of the Order and Criminal Contempt

The second argument which the Journal makes is that it cannot be held in contempt for exercising "pure" speech if the restraining order is later invalidated. This argument is split into two subsidiary arguments: 1) that the circumstances do not satisfy the requirements for a valid prior restraint; and 2) that the First Amendment freedom of the press precludes a finding of criminal contempt.

In addressing the first of these arguments, it is necessary again to briefly review what occurred. The restraining order entered after a conference with all parties in Chambers. The Court offered to hear

---

**2.** In *Chrysler Corp. v. Brown*, 441 U.S. 281, 99 S.Ct. 1705, 60 L.Ed.2d 208 (1979), the court suggested that balancing of interests might be desirable in circumstances such as this where the Freedom of Information Act and the Privacy Act are both involved. 441 U.S. at 293 & n. 14, 99 S.Ct. at 1713 & n. 14. Note 14 points out that 5 U.S.C. § 552(a) unlike the FOIA bars disclosure. *See* 5 U.S.C. § 552a. Although a minority view, injunctive process to prevent disclosure

has been sustained. *Wolman v. U.S. Selective Service System*, 501 F.Supp. 310, 311 (D.D.C. 1980).

**3.** Each of these conclusions may well be without vitality. *See Zweibon v. Mitchell*, 606 F.2d 1172 (D.C.Cir.1979), *cert. denied*, 453 U.S. 912, 101 S.Ct. 3147, 69 L.Ed.2d 997, *reh. denied*, 453 U.S. 928, 102 S.Ct. 892, 69 L.Ed.2d 1025 (1981).

the matter in open Court on the next day, but the Journal's counsel asked for and received an additional day for preparation. In the meantime, however, and within certainly less than twelve hours, the Journal made a deliberate decision to violate the order. Whatever the explanations of its counsel, the testimony of its Executive Editor and the circumstances admit of but one conclusion, that the Journal violated the order because of a firmly held conviction that under no circumstances did any court have any authority to tell it not to publish. Its view of the First Amendment is clearly that it has an irrevocable license to publish whatever it pleases whenever it wishes to do so. Although its statement professed respect for the Judge, its words and actions were those of utter defiance of the constitutional system of justice. It is a system of justice that requires respect. The Journal set itself above the law. In its self-proclaimed "clash" with the Court, it was immediately determined to proclaim itself the victor. Now it argues that the Order was invalid in any event, and hence, it says, a nullity.

The Journal has been seeking to publish the information for many years. It had been denied the information because disclosure would violate Title III. *Providence Journal Co. v. F.B.I.*, 602 F.2d 1010. The United States Supreme Court had declined to intervene, denying certiorari at 444 U.S. 1071, 100 S.Ct. 1015, 62 L.Ed.2d 752 (1980). This decision is not only precedent which this Court is required to follow, it is *res judicata* as to the parties to this action. *Montana v. United States*, 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). In fact, based on the opinion in *Providence Journal Co. v. F.B.I.*, 602 F.2d 1010, disclosure of the information is a felony. 18 U.S.C. § 2511.

 The parties have stipulated that the Journal received the information lawfully. The parties may not stipulate the law, and since this stipulation purports to do so, it is rejected. *Young v. United States*, 315 U.S. 257, 259, 62 S.Ct. 510, 511–12, 86 L.Ed. 832 (1942); *Cloverleaf*

*Butter Co. v. Patterson*, 315 U.S. 148, 152, 62 S.Ct. 491, 493–94, 86 L.Ed. 754 (1942); Annot., 92 A.L.R. 663, 664 (1934). It is for the Court to determine the law, and, in this instance, the lawfulness of the disclosure is more than seriously in question. As has been pointed out previously, the circumstances suggest a willful disclosure of illegally obtained information, an action forbidden by 18 U.S.C. § 2511.

Standing alone, the foregoing circumstances argue strongly for the opportunity for further reflection. The circumstances, however, do not stand alone. Throughout this controversy the Court has not been given, nor has it received, a satisfactory explanation of the basis on which this information was disclosed. This Court was concerned with the spectre of a rule which permits the Government to intrude into everyone's most private thoughts and conversations, obtain them illegally and then publish them to a news organization for dissemination for profit to the public. This was not a novel concern. It was expressed by Chief Judge Pettine to this very Defendant in *Providence Journal Co. v. F.B.I.*, 460 F.Supp. 762. He, in part, observed: "the improper disclosure of information can be used to threaten political expression and coerce conformity." 460 F.Supp. at 777.

The Fourth Amendment is the only amendment to the Constitution that expressly refers to the "right of the people." It was adopted because of the experience of the colonists with writs of assistance which allowed government agents to continually rummage through their homes seeking evidence of smuggling. Any information obtained by the Government in violation of the Fourth Amendment may not be used in Court. Under the Defendants version of the issue, such information could be used by anyone, except in court. The rule necessarily provokes a visceral judicial reaction that this indeed may not be the rule that applies in a civilized society. The issue is one which has not been considered by the United States Supreme Court, nor has it even been squarely faced by any

other Court, except in one instance to be discussed hereafter. The Journal would have the Fourth Amendment confined to the so-called exclusionary rule. Neither by its terms nor by its history is the purport of the amendment so limited. Historically, it was intended to provide security to people from Government intrusion into civil privacy, not solely for the purpose of protecting those people accused of crimes.

Throughout, the Journal has treated the privacy protected by the amendment as if it involved the tort of invasion of privacy. However, the tort action for invasion of privacy had very different progenitors, namely Samuel Warren & Louis Brandeis, who wrote The Right to Privacy, 4 Harv.L. Rev. 193 (1890). The authors base the action upon "the right to be let alone." The historical antecedents are found in English common law and such cases as *Pope v. Curl*, 2 Atk. 342, 26 Eng.Rep. 608 (1741) and *Prince Albert v. Strange*, 2 De G. & Sm. 652, 64 Eng.Rep. 293 (1849). There is no historical relationship between the privacy protected by the Fourth Amendment and the tort action for private invasions of privacy. It is clear beyond doubt that the Fourth Amendment was intended to bar government intrusion. The question surely must be—is the amendment so sterile that it provides no real protection? The Supreme Court has rejected a damages action alternative with respect to the exclusionary rule. Would it do less if the issue involved privacy of one not charged with a crime who was to be tried in the court of public opinion?

Since they were adopted simultaneously, it would make sense that all amendments to the Bill of Rights be construed as a coordinate whole and as part of a coordinate scheme. Reading the First Amendment provision of a free press to cancel out Fourth Amendment security can only be based on the numbering of the amendments. Judicial decisions are not made on such shallow reasoning. Certainly, it does not do violence to the constitutional scheme if a free press were required to respect Fourth Amendment personal security. If reasons are required, they are those stated by Judge Pettine in *Providence Journal Co. v. F.B.I.*, 460 F.Supp. at 771, 777, that a constitutional right without a remedy is a hollow pronouncement, and, that a contrary view would permit the Government to destroy those whom it perceives as its enemies by disclosing unlawfully obtained information to the free press. Total freedom would thus be granted to the Government and the press and denied the people. It is quite possible that a reasoned judicial consideration might well find such a result totally unacceptable.

There is much information that is denied to a free press. To begin with, it has no right to force any person to provide it with information. "No comment" is not an uncommon response to its inquiries. Judicial denial of information to the press is not a totally rare occurrence. *See Pell v. Procunier*, 417 U.S. 817, 834 & n. 9, 94 S.Ct. 2800, 2810 & n. 9, 41 L.Ed.2d 495 (1974). It is denied national security information which presents a clear and present danger. *Near v. Minnesota*, 283 U.S. 697, 716, 51 S.Ct. 625, 631, 75 L.Ed. 1357 (1931). Grand Jury proceedings are secret. Fed.R. Crim.P. 6. A newspaper may not use the copyrighted material of others. *Harper & Row v. Nation Enterprises*, —— U.S. ——, ——, 105 S.Ct. 2218, 2228–29, 85 L.Ed.2d 588, 604 (1985). The free press may be prevented from publishing obscene material. *Flynt v. Ohio*, 451 U.S. 619, 622, 101 S.Ct. 1958, 1960, 68 L.Ed.2d 489 (1981). Title III of the Safe Streets Act of 1968 denies it access to information obtained by illegal electronic surveillance, whether that information was obtained before or after 1968. *Providence Journal Co. v. F.B.I.*, 602 F.2d at 1013–14.

█ The Journal's contention that "pure" speech is *per se* entitled to immediate publication finds no support anywhere. Indeed it has been stated that "prior restraints are not unconstitutional *per se.*" *See Southeastern Promotions, Ltd. v. Conrad*, 420 U.S. 546, 558, 95 S.Ct. 1239, 1246, 43 L.Ed.2d 448 (1974) (relating to the theatrical production "Hair").

The real "clash" in this action, the clash between the First and Fourth Amendments, deserves more than a passing glance. It is a real, substantial and indeed vital issue, which does not deserve the cavalier attitude displayed by the Journal. The above analysis demonstrates the absolute need for at least a brief time to consider the merits of this action. The issue is not frivolous.

Should the foregoing be found inadequate to justify a brief respite, there is a further practical consideration. The Court was not informed of the nature of the information itself at the time the restraint issued. This is not to say that the content of the information is itself significant. The Court became aware of the nature of the information only by reading the next day's newspaper. The significance of this observation is that at least a court should be apprised of the information with which it is dealing. In this instance the Journal managed by its own efforts to avoid this scrutiny, although labelling the order "censorship."

■ The fact that the Court ultimately vacated the restraining order and denied a preliminary injunction does not establish that the restraining order is invalid. There are significant differences between a preliminary injunction and a restraining order; that is, a restraining order is intended to hold matters in *status quo* and to prevent ongoing events from mooting a controversy, whereas a preliminary injunction is usually heard after issue has been joined and represents a preliminary judgment on the merits of the cause. In fact, given the time for further unhurried reflection and additional time to research the issues involved, the Court is by no means certain that it should have denied a preliminary injunction. Plaintiff has a powerful Fourth Amendment argument and it is only now that the true effect of the prior litigation involving this information is clearly apparent. It might well be that should the occasion arise in the future a very different result would be reached.

The restraining order which issued has not been held invalid. On reflection, it appears to have been appropriate and tailored to the circumstances. The Court was prepared to grant a forthwith consideration of the issues on the record within less than twenty-four hours of the issuance of the Order. This did not happen because the Court granted the request of the Journal to defer for an additional day, the very time required for the Journal to violate the Order.

■ Whether the restraining order was valid is not dispositive of the contempt issue. Even an invalid restraining order is sufficient basis on which to find contempt of Court. This order was issued to maintain the *status quo* pending determination of the rights of the parties. The authorities are practically unanimous that a restraining order, though legally infirm must be obeyed. If the Court has jurisdiction of the subject matter and the parties, as the Court did in this matter, the fact that the order later turns out to be erroneous has no bearing on whether or not a contempt has been committed. *United States v. Shipp*, 203 U.S. 563, 573, 27 S.Ct. 165, 166, 51 L.Ed. 319 (1906); *United States v. United Mine Workers*, 330 U.S. 258, 289–95, 67 S.Ct. 677, 693–97, 91 L.Ed. 884 (1947); *Anderson v. Dean*, 354 F.Supp. 639, 644–45 (N.D.Ga.1973); 17 Am.Jur.2d *Contempt* § 43; Annot., 12 A.L.R.2d 1059, 1078, § 6 (1950). The philosophical basis of this rule is simple but sound; a Court ought to have time to determine legal issues presented to it, and has the right in the meantime to preserve the *status quo*.

The Journal suggests that the rule is otherwise where "pure" speech is involved. In *Walker v. City of Birmingham*, 388 U.S. 307, 87 S.Ct. 1824, 18 L.Ed.2d 1210 (1967), a case which upheld a finding that racial protesters had been in contempt of a court order forbidding their protest, the Supreme Court stated, "We emphatically reject the notion that the First and Fourteenth Amendments afford the same kind of freedom to those who would communicate ideas by conduct such as patrolling,

marching and picketing on streets and highways, as these amendments afford to those who communicate ideas by 'pure' speech." 388 U.S. at 316, 87 S.Ct. at 1829 (quoting *Cox v. Louisiana,* 379 U.S. 536, 555, 85 S.Ct. 453, 464–65, 13 L.Ed.2d 471 (1965)). In *Cox v. Louisiana,* 379 U.S. 559, 85 S.Ct. 476, 13 L.Ed.2d 487 (1965), *reh. denied,* 380 U.S. 926, 85 S.Ct. 879, 13 L.Ed.2d 814, which involved picketing near a courthouse, the court had also stated, "We are not concerned here with such a pure form of expression as a newspaper comment or a telegram by a citizen to a public official. We deal in this case not with free speech alone but with expression mixed with particular conduct." 379 U.S. at 564. From this language, the Journal draws considerable solace. It supposes that it is involved in "pure" speech and therefore that it should fare differently than those who not only speak out but who also march. It concludes that its involvement in "pure" speech absolves it of any responsibility to obey a restraining order. It cites no authority for this proposition, nor does it suggest any principle which affords to the press less responsibility for obeying a restraining order than other citizens. The type of speech certainly does not set the Journal apart from the citizenry who can be punished for violation of a restraining order prohibiting marches to protest racial discrimination, *Walker v. City of Birmingham, supra,* or the rights of laborers to strike against the Government or others operating coal mines, *United States v. United Mine Workers, supra; Howat v. Kansas,* 258 U.S. 181, 42 S.Ct. 277, 66 L.Ed. 550 (1922).

In *United States v. Dickinson,* 465 F.2d 496 (5th Cir.1972), the district court had ordered that news reporters not report the testimony taken in a case because it might affect trial of the underlying criminal case in a state court. Two reporters ignored the ban on publication, were held in contempt and fined $300 each. The Court of Appeals held that the ban on a free press was "constitutionally unacceptable, and hence illegal." 465 F.2d at 509. The court further held that, in spite of the unconstitu-tional and illegal character of the injunction, a restraining order must be obeyed until set aside subject to three conditions: (1) the court must have subject matter and personal jurisdiction over the action; (2) adequate and effective remedies must be available for orderly review of the challenged ruling, and (3) the order must not require an irretrievable surrender of constitutional guarantees. 465 F.2d at 511. The Court of Appeals remanded the action to the district court to determine whether the judgment of contempt or the punishment was appropriate in light of the constitutional infirmity of the order. The order in *Dickinson, supra,* was blatantly invalid. There was nothing good that could be said in its favor. In the circumstance under consideration, serious, important and close issues are involved, which have not previously been squarely faced. This action fits neatly into the three conditions set forth in *United States v. Dickinson, supra,* and has with it a serious and doubtful issue of constitutional dimension.

In its bench decision on preliminary injunction, the Court relied on two Supreme Court opinions, *Cox Broadcasting Company v. Cohn,* 420 U.S. 469, 95 S.Ct. 1029, 43 L.Ed.2d 328 (1975) and *Landmark Communications, Inc. v. Virginia,* 435 U.S. 829, 98 S.Ct. 1535, 56 L.Ed.2d 1 (1978), which involved efforts to prevent dissemination of news, both based upon state statutes. After additional consideration, the Court finds the issue here quite different in at least two ways: (1) a court has already finally ruled that the Journal was not entitled to have the information, and (2) this controversy appears to pit one constitutional principle against another in a battle not previously fought, each having sound reason for a claim of superiority in the circumstances. This action is also quite different from the issues considered in cases involving clashes between the First Amendment right to a free press and the Sixth Amendment right to a fair trial. A Court can by a variety of actions insulate a jury and leave the press free to peddle its information. This is not true with respect to privacy

interests which require that the information be denied the public in order to be effective as a right. Thus, it is understandable that in *Wood v. Goodson*, 253 Ark. 196, 485 S.W.2d 213 (1972), the court held that an order which prevented a newspaper from publishing a jury verdict in a criminal case was wholly void and that violation of such an order cannot constitute contempt.

It is true that the preservation of a free press is an essential bulwark to a democratic society. Freedom of the press stands high in the list of fundamental and vital rights. When weighted with the right of the public to be free from unreasonable intrusion, the scales would appear to be at least evenly balanced, and hence require that each have at least equal weight.

## IV. SUMMATION; THE COURT'S RIGHT TO DETERMINE CONTROVERSIES

The judicial power of the United States is vested in the courts by Article III of the Constitution. The courts have the right to determine controversies between litigants. *Muskrat v. United States*, 219 U.S. 346, 361, 31 S.Ct. 250, 255, 55 L.Ed. 246 (1911); *General Investment Co. v. New York Central R. Co.*, 271 U.S. 228, 230, 46 S.Ct. 496, 497, 70 L.Ed. 920 (1926). The Court has, as an ancillary power, the authority to punish for contempt. *Michaelson v. United States*, 266 U.S. 42, 65–66, 45 S.Ct. 18, 19–20, 69 L.Ed. 162 (1924).

In this instance the Journal seized the judicial power to itself. This is a serious controversy involving prior court determinations and conflicts between constitutional principles. Although the order might ultimately be held to be invalid, there is enough substance to it to expect law abiding persons to respect it at least briefly. The Journal showed no respect whatsoever, and, therefore, it must be found in contempt of the order entered November 13, 1985.

In *Walker v. City of Birmingham*, 388 U.S. 307, 320–21, 87 S.Ct. 1824, 1832, 18 L.Ed.2d 1210 (1967), the court stated:

[N]o man can be judge in his own case, however exalted his station, however righteous his motives, and irrespective of his race, color, politics, or religion.... [R]espect for judicial process is a small price to pay for the civilizing hand of law, which alone can give abiding meaning to constitutional freedom.

The First Amendment is not the only law to be obeyed. All other provisions of the Constitution must be served, including the Fourth Amendment right of the people to be secure in their homes, papers and effects, and the constitutional right and duty of the court to determine the law under Article III.

The Court will hear the parties at 10:00 A.M., on the 27th day of March, 1986, for the purpose of imposing a penalty upon the Journal and its Executive Editor.

The Special Prosecutor will present a form of Judgment in conformity with this Opinion.

SO ORDERED.